**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| **Kelli McDaniel, individually, and as parent and legal Guardian of K.M., a minor child, Plaintiff,**<br><br>**vs.**<br><br>**Schylling, Inc., Defendant.** | **CIVIL ACTION NO.** 3:26-cv-3620-MGL<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

COMES NOW Plaintiff, Kelli McDaniel, individually, and in her capacity as the parent and natural guardian of K.M, a minor child, by and through her attorneys, Bell Legal Group, LLC, brings this Complaint against Defendant Schylling, Inc. Plaintiff alleges the following based upon personal knowledge and otherwise on information and belief:

## NATURE OF THE ACTION

1. This case concerns Schylling, Inc.'s popular NeeDoh line of squeezable sensory toys. Schylling markets the NeeDoh products for repeated squeezing by children and adults, including at school, at home, in the office, and in the car, and promotes them as sensory toys that can help with relaxation, fidgeting, focus, or stress relief.[1][2]

2. The products share a basic construction: a flexible exterior outer shell encloses a sticky, gel-like, or maltose filling.[3] Schylling sells the same concept in many shapes and sizes, including the Nice Cube, Dream Drop, Original Groovy Glob, Super NeeDoh, Teenie NeeDoh, Gumdrop, Groovy Fruit, Color Changing NeeDoh, Shaggy NeeDoh, Dohnut and Jelly Dohnut, Squeezza,

[1] Schylling Inc., About Us, https://schylling.com/about-us/ (last accessed August 6, 2026).

[2] Schylling Inc., Helping Students Get a GRIP! https://schylling.com/press-release/helping-students-get-a-grip/ (last accessed August 6, 2026)

[3] Schylling FAQ, Are the contents inside my NeeDoh product safe? https://schylling.com/faqs/ (last accessed August 6, 2026).

Nice-sicle, Press Doh, Color Change Cube, and other NeeDoh variants (collectively, the "NeeDoh Products".[4]

3. Although individual models may use different formulations, their shared safety problem is the same: when the enclosed filling becomes heated, its temperature, volume, pressure, or viscosity may change while it remains sealed inside the flexible outer shell. Subsequent handling or squeezing may then cause the product to rupture or explode, ejecting dangerously hot and sticky filling. The filling's ability to adhere to skin can prolong heat exposure, make prompt removal difficult, and cause severe thermal burns.

4. The dangers posed by NeeDoh Products are real, recurring, and severe. As detailed below, numerous reported incidents involving heated NeeDoh Products have resulted in children suffering second- and third-degree burns, hospitalization, permanent scarring, and other serious injuries. At least one seven-year-old child was placed in a medically induced coma due to the severity of the burns.

5. Despite this known danger, Schylling does not warn consumers that heat exposure may cause a NeeDoh Product to rupture or explode and eject hot filling capable of causing severe burns. Schylling warns that the "contents may become hot" when leaving the product in a car or direct sunlight. A separate warning addressing heating, freezing, or microwaving states only that the conduct may cause "personal injury". Neither warning communicates the mechanism or severity of the danger: that when heated, a NeeDoh Product may rupture, burst, or explode and forcefully eject hot, adhesive filling capable of causing severe burns, hospitalization, permanent scarring, or disfigurement. Both warnings are placed on the back of the packaging, where they are unlikely to been seen by the consumer.

6. The heat danger is also not apparent from the NeeDoh Product itself- as it may not feel hot to touch. Upon information and belief, the rubber outer shell does not readily conduct or dissipate heat from the enclosed viscous filling. Thus, the exterior may feel substantially cooler and

---

[4] See e.g., Schylling Inc., Classic NeeDoh—The Original Groovy Glob Sensory Squish, https://schylling.com/product/nee-doh-the-groovy-glob-stress-ball/; Schylling Inc., Super NeeDoh, https://schylling.com/product/super-nee-doh/; Schylling Inc., NeeDoh Nice Cube, https://schylling.com/product/needoh-nice-cube/ (each last accessed August 6, 2026)

provide no warning of the danger, even while the inside filling is hot enough to cause the product to explode and cause severe burns.

7. A reasonable purchaser of a child-oriented sensory toy does not expect that leaving it indoors near a window, in a car, in a classroom, or in another foreseeable location may convert the toy into a pressurized container capable of rupturing and expelling dangerously hot, adhesive filling.

8. Schylling knew of the hazards before K.M. obtained her NeeDoh toy. Public Consumer Product Safety Commission ("CPSC") reports sent to Schylling described NeeDoh Products that burst or exploded during intended play and allegedly caused burns. Other reports and news accounts described NeeDoh Products becoming dangerously hot in cars without ever being placed in a microwave or intentionally heated.

9. By November 2024, if not earlier, children were following a viral social-media practice of microwaving NeeDoh Products to make them softer or squishier. That month, an eleven-year-old reportedly followed a TikTok recommendation to microwave a NeeDoh for that purpose; the product burst while he held it, causing third-degree burns, months of treatment, infection, lasting scars, and continuing limitations. His family reported that the unit carried no warning.[5]

10. Schylling knew or should have known of the social media trends and the dangers the products posed when exposed to heat. In a 2023 marketing release, it celebrated NeeDoh's "unflinching grip" on social media, touted more than 150 million—and elsewhere in the same release more than 200 million—TikTok view sand directed consumers to follow @NeeDohOfficial. Social media was therefore a cultivated marketing channel that Schylling had reason and the ability to monitor for foreseeable product use and misuse.[6]

11. Despite the social media trend, Schylling's warning response was delayed, incomplete, and ineffective. On January 14, 2025, after Inside Edition reported yet another child suffering facial burns when a microwaved NeeDoh burst, Schylling responded that it added a warning, but the

---

[5] Lauren Harksen, Jefferson County Teen Burned by Microwaved NeeDoh Toy Warns Others About TikTok Trend, WBRC (July 7, 2026, updated July 12, 2026), https://www.wbrc.com/2026/07/08/jefferson-county-teen-burned-by-microwaved-needoh-toy-warns-others-about-tiktok-trend/ (last accessed August 6, 2026).

[6] Schylling, Helping Students Get a Grip, supra note 2.

warning was only on its website. In March 2025, Schylling finally stated that it had added warnings to its packaging.[7], [8]

12. When Schylling did warn, it still did not explain the actual danger. An earlier warning attributed to NeeDoh packaging stated: "CAUTION: Do not leave in car or direct sun. Contents may become hot." The later warning, now also states: "Do NOT heat, freeze, or microwave, may cause personal injury."[9]

13. Neither warning discloses the actual nature and seriousness of the danger—that heat can cause the NeeDoh Product to rupture or explode, eject sticky filling, and severely burn the user. The earlier warning names a car and direct sun but describes only the commonplace condition that contents may become hot—not the resulting rupture, explosion, adhesion, or burn hazard. The later warning omits cars, sunlight, windows, and ambient heat altogether and identifies only unspecified "personal injury." Neither enables a parent, teacher, caregiver, or child to understand the actual risk.

14. The microwave incidents demonstrate why a generic warning is inadequate. Saying only that heating "may cause personal injury" does not warn that the sealed toy may explode within

---

[7] Inside Edition, Girl Burned After NeeDoh Toy Explodes in Microwave (Jan. 14, 2025), https://www.insideedition.com/media/videos/8-year-old-girl-suffers-burns-on-face-after-needoh-toy-explodes-in-microwave-90066 (last accessed August 6, 2026).

[8] Andryanna Sheppard, Nonprofit Demands Investigation into Sensory Toy After Reports of Blisters, Burn Marks, FOX5 Vegas (Mar. 20, 2025), https://www.fox5vegas.com/2025/03/21/nonprofit-demands-investigation-into-sensory-toy-after-reports-blisters-burn-marks/ (last accessed August 6, 2026).

[9] Schylling's current product pages repeat substantially the same warning across their differently shaped and filled NeeDoh products: See, e.g. https://schylling.com/product/needoh-nice-cube/; https://schylling.com/product/nee-doh-the groovy-glob-stress-ball/; https://schylling.com/product/color-changing-nee-doh/; https://schylling.com/product/jelly-dohnut-needoh/; https://schylling.com/product/teenie-nee-doh/ (last accessed August 6, 2026).

seconds and eject filling hotter than 200°F that can stick to skin and cause immediate or deep thermal injury. [10], [11],[12]

15. Heat exposure, without a microwave, is also a known danger. South Carolina routinely experiences extreme heat conditions, and sunlight passing through windows can rapidly heat enclosed spaces. Official heat guidance warns that parked-vehicle temperatures can rise approximately 20°F in ten minutes and 50°F in an hour, even when outdoor temperatures are only in the 70s. Against that background, storage in cars, classrooms, homes, or near windows is not remote misuse; it is a foreseeable condition of sale and use in South Carolina.[13]

16 After-the-fact warnings do not substitute for a manufacturer's clear warning before purchase and injury. Parents, teachers, and children should not have to learn the product's explosive failure mechanism from emergency physicians or a news report after someone is burned. [14]

17. Moreover, Schylling markets NeeDoh Products as portable products intended for use outside the home. Schylling promotes NeeDoh Products for use in the car, anywhere at any time, including on-the-go. Through its official TikTok account, @needohofficial, Schylling affirmatively published videos depicting NeeDoh products being used inside a vehicle and being arranged on a windowsill in direct sunlight. Schylling goes further with the NeeDoh Mello

---

[10] See https://schylling.com/press-release/helping-students-get-a-grip/ (last accessed August 6, 2026).

[11] Mayra Franco, Popular Squishy Toy Sends Teen to Hospital with Burns, What Parents Should Know, KMPH FOX26 (July 7, 2026, updated July 8, 2026), https://kmph.com/news/local/popular-squishy-toy-sends-teen-to-hospital-with-burns-what-parents-should-know (last accessed August 6, 2026)

[12] Lauren Kirchner, Squishy Toys Can Be a Sticky Mess, (Dec. 16, 2025), Consumer Reports, (Some sampled toys exploded after roughly 15 seconds in a microwave and exceeded 200°F. CR also recounted a June 2025 report in which a parent picked up a NeeDoh Dream Drop from a car seat and boiling-hot, glue-like gel allegedly poured onto her hand, causing second-degree burns.)

[13] See South Carolina Department of Public Health, Prevent Vehicular Heatstroke (updated June 22, 2026), https://www.cdph.ca.gov/Programs/OPA/Pages/Communications-Toolkits/Heat-Summer-Safety.aspx; National Weather Service, Look Before You Lock!, https://www.weather.gov/lmk/beat_the_heat_and_check_the_back_seat (last accessed August 6, 2026).

[14] See Franco, KMPH FOX26, supra note 12.

Mallo—a filled sensory toy recommended for children ages three and older—which it expressly markets for intentional sun exposure. Schylling's website instructs consumers to "set it in the sun and watch as the colors toast and transform," while its official Instagram post states, "Sunshine just upgraded your squeeze game" and "The NeeDoh Mello Mallo changes color in the sun," as shown in the screenshot below. Schylling thus promotes NeeDoh Products for use and storage in the same heat-prone environments implicated by its warnings.[15] [16]

[15] See e.g. https://www.tiktok.com/@needohofficial/video/7633446651864091934 and https://www.tiktok.com/@needohofficial/video/7637140866527677726 (last accessed August 6, 2026).

[16] Schylling Inc., NeeDoh Mello Mallo,https://schylling.com/product/needoh-mello-mallo/; NeeDoh Official, "Sunshine just upgraded your squeeze game," Instagram, https://www.instagram.com/reel/DLIDm_ETm-r/ (last accessed August 6, 2026)


NeeDoh MELLO MALLO changes color in the sun!
needohofficial • Follow
[redacted] • East Coast Summers
needohofficial Sunshine just upgraded your squeeze game
The NeeDoh Mello Mallo changes color in the sun - just in time for the longest day of the year!
[redacted] Sooo good
1 like Reply
[redacted] Gimme it
1 like Reply
[redacted] I HAVE THE YELLOW ONEEEE
1 like Reply
[redacted] wonder what this feels like
1 like Reply
[redacted] That's so cool!!!
2 likes Reply


NeeDoh MELLO MALLO changes color in the sun!
needohofficial • Follow
[redacted] • East Coast Summers
needohofficial Sunshine just upgraded your squeeze game
The NeeDoh Mello Mallo changes color in the sun - just in time for the longest day of the year!
58w
[redacted] Sooo good
47w 1 like Reply
[redacted] Gimme it
50w 1 like Reply
[redacted] I HAVE THE YELLOW ONEEEE
55w 1 like Reply
[redacted] I wonder what this feels like
58w 1 like Reply
[redacted] That's so cool!!!
526 likes
June 20, 2025
Add a comment...
Post

18. Schylling's own marketing therefore depicts and encourages use in the same outdoor and automobile environments in which exposure to sunlight and elevated temperatures is reasonably foreseeable. Yet Schylling does not disclose in those posts that the product's sealed construction may trap heat within the filler, that the exterior may not reliably reveal the internal temperature, or that a heated product may rupture when subsequently handled or squeezed. Nor do the posts warn that the expelled scalding filler may come out of the ruptured Product, adhere to the skin, and cause severe burns.

19. This omission is not cured by Schylling's label stating only: "Do NOT leave in a hot car or direct sun: contents may become hot." The phrase "may become hot" does not disclose that the contents may become scalding, that heat may produce internal pressure and rupture or explode, or that it may cause serious burn injuries. Schylling thus simultaneously depicts children using NeeDoh outdoors and in automobiles while withholding from those same consumers the actual nature and severity of the heat-related hazard associated with those foreseeable settings.

20. On or about May 24, 2026, Plaintiff's minor child, K.M., briefly microwaved the product in a manner substantially similar to the conduct that Schylling knew or should have known children were undertaking nationwide, as was being shown on social media outlets including Tik Tok. After being removed from the microwave, the exterior of the Nice Cube did not appear dangerously hot. When K.M. squeezed the product during ordinary intended use, the Nice Cube ruptured or exploded and forcefully expelled extremely hot filler onto her arm, causing painful burns, blistering, redness, irritation, and other injuries. Due to its sticky and adhesive nature, the filler adhered to her skin and prolonged heat exposure, worsening the resulting injuries.

21. Schylling knew children were microwaving NeeDoh products as part of a widespread viral trend, knew catastrophic burn injuries had already occurred, and nevertheless failed to warn consumers that a heated NeeDoh could become internally superheated, rupture or explode upon handling, and eject adhesive filler capable of causing severe thermal burns despite the exterior appearing safe to touch. Had Schylling adequately disclosed that microwave exposure could cause the enclosed filler to become superheated, create internal pressure, and cause the product to rupture or explode while being handled or squeezed, Plaintiff would not have permitted the product to be microwaved.

22. Schylling's actions and omissions related to the NeeDoh Products are not its first instance of placing profits above children's safety. Schylling previously paid a $400,000 civil penalty to resolve CPSC allegations that it knowingly distributed children's toys containing unlawful levels of lead, continued shipping similar toys for months without testing its inventory, and failed to notify CPSC for five years—acting only after a newspaper investigation exposed the hazard. A CPSC Commissioner described the conduct as creating an "actual risk of harm to children."[17]

23. Plaintiff seeks compensation for the individual physical injuries suffered by her minor child, K.M. and related losses. On behalf of the proposed South Carolina Class, she seeks economic relief for purchases made without disclosure of the latent safety defect and injunctive relief requiring truthful, specific warnings and other appropriate corrective measures. On behalf of a South Carolina Injury Subclass, she also seeks adjudication of common strict-liability issues and recovery for persons physically injured by the same rupture hazard.

**THE PARTIES**

24. Plaintiff Kelli McDaniel is a citizen of South Carolina, who resides in Richland County with K.M., her minor child. K.M. received a NeeDoh Nice Cube in South Carolina for personal, family, or household purposes and suffered physical and economic injury in this District.

25. Plaintiff's minor child was eleven years old at the time of the incident. Schylling specifically promotes NeeDoh Products as sensory and fidget products as appropriate for schools and those with special needs, and as products that may help with anxiety, focus, attention, and centering. Given NeeDoh Products' popularity and marketed use, K.M., an involved student-athlete, was enticed to possess a NeeDoh product.[18] [19]

---

[17] See Schylling Associates, Inc.; Provisional Acceptance of a Settlement Agreement and Order, 75 Fed. Reg. 30,784, 30,785–87 (June 2, 2010), https://www.federalregister.gov/documents/2010/06/02/2010-13088/schylling-associates-inc-provisional-acceptance-of-a-settlement-agreement-and-order; see also Statement of Comm'r Anne M. Northup on the Proposed $400,000 Civil Penalty Settlement for Schylling Associates, Inc. 1 (May 25, 2010), https://www.cpsc.gov/s3fs-public/pdfs/foia_schylling05252010.pdf.

[18] See https://schylling.com/press-release/helping-students-get-a-grip/ (last accessed August 6, 2026).

[19] See Schylling product pages, supra note 4.

26. Defendant Schylling, Inc. ("Schylling" or "Defendant") is a Delaware corporation headquartered in North Andover, Massachusetts. Schylling designs, manufactures, tests, labels, advertises, distributes, warrants, and sells the NeeDoh Products throughout South Carolina and the United States.[20]

**JURISDICTION AND VENUE**

27. This Court has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class contains at least 100 members, at least one Class member is a citizen of a state different from Defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

28. Minimal diversity exists because Plaintiff and members of the proposed South Carolina Classes are citizens of South Carolina, while Defendant Schylling, Inc. is a citizen of Delaware, where it is incorporated, and Massachusetts, where it maintains its principal place of business.

29. The amount in controversy is satisfied because Schylling has stated that more than 100 million NeeDoh units have been sold, the products are broadly sold through national and South Carolina retailers, and the Class seeks restitution, actual damages, statutory remedies, punitive damages where available, attorneys' fees, and injunctive relief. On information and belief, South Carolina sales and the value of the requested relief exceed $5,000,000.00 in the aggregate.

30. This Court has personal jurisdiction over Schylling because Schylling purposefully directs, distributes, markets, and sells NeeDoh Products to South Carolina consumers through established retail and e-commerce channels; derives substantial revenue from those sales; and the claims arise from a NeeDoh Product sold to and used by Plaintiff in South Carolina.

31. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred here: Plaintiff resides in South Carolina, received the NeeDoh in South Carolina, encountered Defendant's omissions and warnings here, used the product here and was injured here. Assignment to the Federal District of South Carolina is proper under South Carolina Local Civil Rules 3.01(A)(1).

---

[20] See Schylling, About Us, supra note 1.

## FACTUAL ALLEGATIONS

### A. Schylling's NeeDoh Product Line and Marketing

32. Schylling describes NeeDoh as a leading sensory and fidget brand built around soft, stretchy dough or gel-filled products intended to be squeezed, pulled, or smushed repeatedly. The products are marketed for ages 3 and older.

33. Schylling does not market NeeDoh Products as requiring special temperature-controlled storage. It markets them as portable toys for ordinary life— at home, in classrooms, offices, cars, party settings, and "anywhere at any time." Schylling's marketing encourages consumers to keep the products nearby and use them throughout the day.[21]

34. Schylling also promotes NeeDoh Products as particularly suitable for schools, people with special needs, and consumers with anxious tendencies or a need for focus and centering. This marketing predictably places the products in children's hands and in classrooms, desks, window side areas, and in vehicles.

35. The intended and reasonably foreseeable users include children, including children who may have autism, ADHD, anxiety, or other sensory needs. Such consumers may squeeze, carry, drop, leave, retrieve, or store the toys in the same ordinary locations in which children use and keep other toys.

36. Schylling capitalized on the products' social-media popularity. Its own press materials stated that the NeeDoh line had generated more than 200 million TikTok views, encouraged consumers to showcase playing with their NeeDoh products, and promoted its official social account. Schylling thus used TikTok and related platforms to create demand and had reason to monitor how the same child-oriented product was being displayed and manipulated. Social-media-driven demand increased both sales and the foreseeability that children would experiment with the products' texture to share and gain views.[22]

---

[21] See Schylling, Helping Students Get a GRIP! available at: https://schylling.com/press-release/helping-students-get-a-grip/ (last accessed August 6, 2026).
[22] *Id.*

37. NeeDoh Products vary in size, shape, color, and particular filling, but each relevant product is sold as the same essential experience: a sealed, flexible, filled object designed to be compressed and to return to its original form. The products are substantially similar with respect to the alleged defect, the omitted heat-and-rupture hazard, the intended use, the target consumer, and the warnings at issue.

38. Schylling's own current labeling practice confirms that it treats heat exposure as a common NeeDoh-line hazard. Across many differently shaped and filled NeeDoh product pages, Schylling repeats the same or substantially similar instruction not to heat, freeze, or microwave because personal injury may result.[23]

39. The Class allegations do not depend on every formula being chemically identical. They depend on the common, undisclosed fact that the NeeDoh Products are sealed, filled squeeze toys that can rupture and expose consumers to hot, adhesive, or irritating filling under foreseeable conditions, and on Schylling's common failure to communicate the specific nature and consequences of that hazard.

**B. The Common Rupture, Heat, and Skin-Exposure Hazards**

40. NeeDoh Products are designed to be squeezed and contain a thick, sticky filling inside a flexible outer material, or "shell." This sealed flexible object filled with viscous material experiences internal pressure when squeezed and its contents expand or change viscosity with temperature. The outer shell can break open during use or after becoming too hot. When that happens, the filling may burst onto a user's skin.

41. Schylling states that most NeeDoh products consist of a thermoplastic rubber ("TPR") outer shell filled with polyvinyl alcohol ("PVA") or maltose. Upon information and belief, the combination of a polymer shell and a highly viscous filler impedes the toy's ability to dissipate heat quickly and uniformly. Polymers generally have low thermal conductivity, and high viscosity suppresses the internal circulation that otherwise transfers heat through a liquid. Consequently, after exposure to a microwave, direct sunlight, or a hot vehicle, portions of the enclosed filling may remain dangerously hot even when the outside shell feels cool. The exterior may therefore fail to provide an adequate or timely indication of the temperature of the material

[23] See Schylling product warnings, supra note 9.

inside.[24] In fact, published reports describe this exact scenario, when a child touches the NeeDoh Product, it does not feel hot before it explodes the boiling liquid causing severe burns.[25] [26] This was Plaintiff's experience as well.

42. Governmental authorities have likewise recognized that the internal heat danger presented by gel-filled squishy toys may be concealed from the user. In June 2026, Gloucestershire Trading Standards warned that, although "the outside may feel cool," the enclosed gel "can become extremely hot and may burst, causing burns or other injuries."[27]

43. Heating also increases the danger that a squishy gel toy will rupture and release its contents. Consumer complaints, CPSC reports, and independent testing describe NeeDoh and similar filled squeeze toys that broke, burst, popped, or exploded during ordinary use or after heat exposure. Consumer Reports further found that extreme temperature changes can make squeeze toys break open more easily and that some sampled toys exploded after approximately fifteen seconds of microwave heating and exceeded 200°F.[28]

44. These risks are not apparent to an ordinary consumer, particularly a child. A warning merely stating that the "contents may become hot" does not disclose that the exterior may not reliably indicate the temperature of the filling; that dangerous heat may remain concealed inside the toy;

---

[24] See Zewei Cai et al., Progress of Polymer-Based Thermally Conductive Materials by Fused Filament Fabrication: A Comprehensive Review, 14 Polymers 4297 (2022), https://doi.org/10.3390/polym14204297 (explaining that polymers typically possess low thermal conductivity); Thilakavathi Ramamurthy & Suresh Krishnan, Influence of Viscosity on the Thermal Behavior of Fluids in a Sealed Can, 61 Alexandria Engineering Journal 7833, 7833–42 (2022), https://doi.org/10.1016/j.aej.2022.01.038)

[25] Abigail Mableson, Warning over 'explosive' squishy toy trend landing children in hospital with severe burns and needing skin grafts, The Sun, (June 29, 2026) https://www.thesun.co.uk/news/39579763/explosive-squishy-toy-burns-children-hospital/ (reporting that while the outside may feel cool, the gel inside can become extremely hot and may burst, causing burns or other injuries).

[26] Ben Cost Authorities warn parents about dangerous TikTok challenge with popular children's toy that causes 'traumatizing' burns, New York Post, (May 4, 2026) https://nypost.com/2026/05/04/lifestyle/popular-needoh-toy-tiktok-challenge-leaves-child-with-traumatizing-burns/ (Describing that because of the rubber outer layer, they couldn't feel how hot it was inside, so her friend squeezed it, which is when it burst onto both of them).

[27] See https://www.gloucestershire.gov.uk/gcc-news/news-june-2026/nearly-2-000-unsafe-squishy-toys-seized-by-trading-standards/

[28] See Kirchner, Consumer Reports, supra note 12.

that squeezing the toy may cause it to rupture and suddenly discharge the heated filling; cause severe burns, or that the hot, viscous material may adhere to the skin, prolong exposure, and aggravate the resulting burn.

45. When a NeeDoh Product's outer shell opens under pressure, the contents may be expelled rather than merely leak slowly. Consumers and public reports accordingly describe products that "burst," "busted," "popped," or "exploded."[29]

46. The risk is not limited to deliberate microwaving. Cars, sunlit rooms, windows, backpacks, outdoor play areas, and other common locations can expose toys to elevated temperatures. A toy marketed for use in the car and "anywhere at any time" foreseeably will sometimes be left where ambient heat accumulates.

47. That exposure is particularly foreseeable in South Carolina. State public health authorities maintain extreme-heat guidance, and the National Weather Service explains that solar energy entering through glass causes parked vehicles to heat rapidly and that cracking the windows provides little protection. A filled toy marketed for cars, schools, homes, and use anywhere should be designed and warned for those predictable heat conditions.[30]

48. The filling makes the injury much worse. Unlike burning water, which may run off skin, reports describe heated NeeDoh Product filling as glue-like or taffy-like. Adhesion can hold hot material against skin, complicate removal, and compound the severity of the burns.[31]

49. The filling can also cause skin irritation apart from, or in combination with, heat. Consumer Reports identified maltose or malt extract in the Nice Cube and PVA in the Groovy Glob. Its experts stated that either material could irritate some skin and that elevated temperatures could

---

[29] *Id.*

[30] See SCDPH, supra note 13.

[31] Josh Taylor, West Virginia Teen Burned After Popular Toy Left in Hot Car Explodes, Mom Says, CBS News Pittsburgh (updated June 29, 2026), https://www.cbsnews.com/pittsburgh/news/girl-burned-after-popular-toy-left-in-hot-car-explodes-mom-says/ (last accessed August 6, 2026).

worsen irritation.[32] A dermatologist similarly explained that children's thinner skin makes any reactions more pronounced.[33]

50. Schylling maintained that the identified ingredients would not burn skin at room temperature. Even Schylling's position, however, points to heat as an explanation for reported injuries and does not eliminate the separate danger of thermal burns from heated sticky filling.

51. Consumer Reports separately heated sample squishy toys and found that some exploded after about 15 seconds in a microwave and reached temperatures above 200°F—hot enough, according to CR's safety experts, to cause immediate tissue damage. This brief testing illustrates the speed and severity with which a toy designed for small children can become a burn hazard when exposed to heat.[34]

52. The microwave incidents are relevant because they demonstrate a known issue—rapid internal heating followed by rupture and release of scalding, adhesive material—and because Schylling's response shows its knowledge and ability to add warnings across the entire product line.

53. They are also relevant to foreseeability. Schylling marketed NeeDoh to children and publicized the brand's social-media popularity. By November 2024, the microwave practice had caused a documented third-degree burn injury, and by early January 2025 Schylling had added a website warning. Once Schylling knew or should have known that children were engaging in that conduct, a generic warning of unspecified "personal injury" did not fully communicate the known risks of explosion, scalding temperature, adhesion, and severe burns.[35],[36],[37]

54. Upon information and belief, a safer design was technologically and economically feasible, including a more heat-stable and less irritating filling, a filling that does not adhere to skin, a stronger or differently constructed exterior and seam, a design that tolerates foreseeable

---

[32] Kirchner, Consumer Reports, supra note 12.
[33] *Id.*
[34] See Kirchner, Consumer Reports, supra note 12.
[35] See Harksen, WBRC, supra note 5.
[36] See Inside Edition, Girl Burned After NeeDoh Toy Explodes, supra note 7.
[37] See Franco, KMPH FOX26, supra note 11.

temperature and pressure changes without rupture. Separately, clearer temperature, storage, rupture, burn, and first-aid warnings were feasible.

**C. Prior Reports, Complaints, and Schylling's Notice**

55. Consumer complaints related to the danger NeeDoh Products presented were widespread before Plaintiff's purchase.

56. On October 29, 2024, a consumer reported to the CPSC that an eight-year-old was playing with a NeeDoh Nice Cube when it burst and the liquid contacted his leg, allegedly causing chemical burns to his calf and ankle. The CPSC database states that the report was sent to Schylling on November 4, 2024.[38]

57. That report identified the manufacturer, brand, model, registration or serial information, UPC, retailer, purchase date, injury, and photographs. It therefore gave Schylling specific notice of a Nice Cube rupture during ordinary child play and alleged burns and injuries from the contents.

58. In November 2024, the social media trend also materialized in a catastrophic injury. An eleven-year-old reportedly saw a TikTok trend recommending that users microwave a NeeDoh to make it "squishier". When he held and squeezed the warmed product, it burst over his neck, chest, and hands, causing third-degree burns, approximately four months of treatment, infection, lasting scars, and continuing limitations. The family reported that the product carried no warning at the time.[39]

59. That incident establishes that the NeeDoh microwave practice existed by November 2024 at the latest. It also occurred after Schylling had publicly celebrated NeeDoh's enormous TikTok audience and its deliberate social-media marketing.[40]

---

[38] U.S. Consumer Product Safety Commission, SaferProducts.gov Incident Report No. 20241029-BE8B0-2147335660 (published Nov. 19, 2024), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=4970013 (last accessed August 6, 2026).
[39] See Harksen, WBRC, supra note 5.
[40] See Schylling, Helping Students Get a GRIP!, supra note 2.

60. On January 14, 2025, Inside Edition reported that an eight-year-old suffered facial burns when a microwaved NeeDoh burst. The report further stated that Schylling had added the "Do not heat, freeze, or microwave, may cause personal injury" warning, but only to its website – not the packaging – the previous week.[41]

61. On January 12, 2025, another consumer reported that an undamaged NeeDoh Nice Cube exploded while a ten-year-old used it as intended. The report described a chemical burn on the child's forearm and emergency-department treatment. The CPSC database states that the report was sent to Schylling on January 15, 2025.[42]

62. The January 2025 report was especially significant because it expressly stated that the toy was being used as intended, had not been damaged before the incident, and "exploded." The allegations thus could not reasonably be dismissed as involving only microwave misuse.

63. In March 2025, Consumer Reports publicly asked the CPSC to investigate the Nice Cube and similar sensory squeeze toys after identifying reported blisters and burns. The request drew public attention to both intended-use ruptures and severe microwave-heating incidents.

64. Schylling responded publicly that misusing a NeeDoh Product by heating, microwaving, or freezing was dangerous and may cause injury. Schylling further stated that it had added a warning to NeeDoh packaging and its website.[43]

65. That response demonstrates, at minimum, Schylling's actual knowledge by March 2025 that temperature changes could cause personal injury, that the existing warning program required revision, and that the issue applied broadly enough to warrant changes to NeeDoh packaging and the brand website.

[41] See Inside Edition, Girl Burned After NeeDoh Toy Explodes, supra note 7.
[42] U.S. Consumer Product Safety Commission, SaferProducts.gov Incident Report No. 20250112-1FB5A-2147333937 (published Jan. 30, 2025), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=5108893 (last accessed August 6, 2026).
[43] See Sheppard, FOX5 Vegas, supra note 8.

66. A June 2025 incident described by Consumer Reports involved no microwave. A parent reported that a NeeDoh Dream Drop left on a car seat became so hot that boiling, glue-like filling poured onto her hand when she picked it up, allegedly causing second-degree burns.[44]

67. In August 2025, a CPSC report described a Groovy Fruit NeeDoh that burst while a ten-year-old squeezed and twisted it in a car. The parent reported burning followed by painful skin injuries across the child's hands. The CPSC database states that the report was sent to Schylling on August 8, 2025.[45]

68. These reports spanned at least three distinct NeeDoh forms—the Nice Cube, Dream Drop, and Groovy Fruit—and included intended play, ordinary handling after car storage, heat, rupture, sticky filling, and skin injury. They placed Schylling on notice that the concern was broader than one product, one batch, one filling, or one social-media challenge.

69. On June 10, 2026, KRQE reported that a thirteen-year-old suffered third-degree burns from a NeeDoh that had been left in a hot car for hours. When she later squeezed it, the toy allegedly exploded and released scalding, sticky filling onto her arms and legs. The incident involved no microwave and demonstrated that foreseeable environmental heat alone could create the same explosive, adhesive burn mechanism.[46]

70. The New Mexico incident was consistent with the earlier Dream Drop hot-car burn, the Groovy Fruit car rupture, and Schylling's own instruction not to leave NeeDoh Products in cars or direct sun. It further demonstrated that describing contents merely as becoming "hot" did not adequately communicate the risk of explosion, third-degree burns, and sticky filling that can remain attached to skin. These and subsequent reports corroborate the same non-microwave,

---

[44] See Kirchner, Consumer Reports, supra note 12.

[45] U.S. Consumer Product Safety Commission, SaferProducts.gov Incident Report No. 20250805-17290-2147328916 (published Aug. 22, 2025), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=5464670 (last accessed August 6, 2026).

[46] Marilyn Upchurch, New Mexico Teen Gets 3rd Degree Burns from Viral NeeDoh Toy After Leaving It in Hot Car, KRQE News 13 (June 10, 2026, updated June 11, 2026), https://www.krqe.com/news/new-mexico/new-mexico-teen-gets-3rd-degree-burns-from-viral-needoh-toy-after-leaving-it-in-hot-car/ (last accessed August 6, 2026).

heat-related failure mode and the continuing need for corrective relief, not as evidence of Schylling's knowledge before Plaintiff's purchase.

71. By July 2026, Schylling again acknowledged the continuing trend of serious burn incidents. Contemporaneous hot-car reporting underscored that ordinary consumers did not appreciate the hazard. After a hot squishy toy ruptured onto a thirteen-year-old's leg, the parent explained: "It's a toy. You don't think how this could be dangerous." The report also stated that dozens of CPSC reports described ruptures, irritation, and burns, with several involving toys left in hot cars.[47]

72. Another report stated that the hot, thick filling on the child's lap had to be removed with saline in an emergency department and that Poison Control described approximately half a dozen local calls involving squishy toys. Consumers thanked the family for publicizing a risk they had not previously considered.[48]

73. South Carolina medical providers were encountering the same mechanism. On or about January 11, 2025 a ten-year-old girl in South Carolina was playing with her NeeDoh Nice Cube in accordance with its intended use when the toy exploded and caused a chemical burn on her arm. Her injuries required Emergency Department treatment

74. The need for burn specialists, emergency departments, and news outlets to issue reactive public warnings underscores the inadequacy of product warnings that consumers received before the incidents. Schylling possessed product-specific information and controlled the packaging, design, and post-sale communications through which a timely and effective warning could be given.

75. Long before Plaintiff's minor child received her Nice Cube, Schylling possessed information from consumer complaints, CPSC reports, its own investigation and testing, public advocacy, media inquiries, and communications with regulators sufficient to know of the heat, rupture, burn, adhesion, and irritation hazards alleged here

**D. Schylling's Warnings Were Absent, Incomplete, or Inadequate**

---

[47] Brenda Ordonez, Squishy Toy Left in Hot Car Burns Teen, Family Warns Parents, FOX19 (June 30, 2026), https://www.fox19.com/2026/06/30/squishy-toy-left-hot-car-burns-west-virginia-teen-family-warns-parents (last accessed August 6, 2026).
[48] See Taylor, CBS News Pittsburgh, supra note 31.

76. The available record shows an absent, incomplete, and reactive warning program. The family of the child burned in November 2024 reported that his NeeDoh carried no warning. Inside Edition reported on January 14, 2025, that Schylling had only added a website warning the preceding week. In March 2025, Schylling said it had added a warning to packaging and its website.[49],[50]

77. An earlier warning attributed to NeeDoh packaging states: "CAUTION: Do not leave in car or direct sun. Contents may become hot." The later-added warning, now repeated on many Schylling product pages, states: "Do NOT heat, freeze, or microwave, may cause personal injury."

78. Neither adequately warns that heat may cause the inner filling to get dangerously hot, rupture, burst, or explode and cause severe burns Neither identifies the means by which injury occurs: hot sticky filling exploding onto the consumer.

79. The earlier warning identifies a car and direct sun, but its statement that contents may become "hot" minimizes rather than explains the resulting danger. Consumers routinely encounter objects that become warm in sunlight without becoming pressurized, rupturing, spraying adhesive filling, and causing serious burns. The omitted consequences are what make the condition dangerous.

80. The later warning is deficient in a different and additional way. It omits cars, direct sun, indoor windows, and accumulated ambient heat altogether, even though Schylling markets NeeDoh for use in cars, on the go and "anywhere at any time." Its phrase "may cause personal injury" also fails to identify the type, severity, or mechanism of injury, including rupture or explosion, immediate thermal burns, continued heat transfer from adhering filling, skin irritation, blistering, scarring, or injury to the eyes and face.

81. Even as to the conduct it expressly mentions, the warning is incomplete. Telling a child or parent only that microwaving "may cause personal injury" does not disclose that a sealed toy may explode after brief heating and eject sticky material that remains on skin and can cause

---

[49] See Harksen, WBRC, supra note 5.
[50] See Inside Edition, Girl Burned After NeeDoh Toy Explodes, supra note 7.

immediate or deep burns. Nor does it warn consumers not to squeeze, puncture, or handle a warmed product while it cools.

82. The inadequacy is demonstrated by the injuries themselves. The November 2024 victim suffered full-thickness burns and lasting scars; the January 2025 victim suffered facial burns; and the June 2026 hot-car victim suffered third degree burns. A warning that says only "may cause personal injury" or that contents "may become hot" omits the critical consequences that make the danger comprehensible: rupture or explosion, hot adhesive filling, immediate severe burns, scarring, infection and permanent disfiguration.

83. The warnings also fail to provide adequate storage instructions. The earlier warning identifies cars and direct sun but does not explain that those conditions may lead to rupture, explosion, ejection, or burns. The later warning does not identify cars or sunlight at all. Neither identifies a maximum safe temperature; explains that indoor window exposure can be dangerous; instructs consumers that the product may not feel hot despite containing dangerously hot filler; or explains how long to wait to play with the toy after heat exposure.

84. Nor do the warnings provide first-aid instructions suited to a sticky heated filling. They do not tell consumers how to remove adhering material without pulling skin, how long to cool the affected area, when to contact Poison Control, or when to seek emergency care.

85. The only heat-related warning appears in small print on the back of the packaging, while the front facing panel promotes NeeDoh Products as a safe, soothing, toy. Any warning placed only on the back of disposable outer packaging is also inadequate for a durable toy likely to remain in use after the packaging is discarded.

86 Schylling could have used clear language at little cost. Its failure to communicate comparable information rendered the warnings inadequate.

87. Schylling's selective warnings demonstrate that when its financial interests were threatened, it knew how and was willing to communicate forcefully, specifically, and conspicuously. Schylling issued a prominent OFFICIAL STATEMENT and FRAUD ALERT, identified

specific sellers and platforms, directed consumer authorized channels, and ironically, associated its official products with "safety".[51]

88. But when an equally conspicuous and specific warning about genuine NeeDoh products potential to rupture, explode, and severe burn hazards could discourage purchases and hurt its bottom line, Schylling made no comparable official statement or alert. Despite numerous injuries and reports, including children being hospitalized and put into a coma.

89. The disparity supports an inference that Schylling's omissions were not caused by an inability to communicate the danger. Rather, Schylling warned consumers specifically when doing so protected sales while withholding comparable specificity when it might discourage sales.

90. Had Plaintiff received a conspicuous and specific warning identifying rupture, explosion, sticky hot filling, burns, indoor sunlight, and the need to cool before handling, she would not have purchased the product.

**E. Schylling Conceals and Minimizes the Explosion and Burn Hazard**

91. Nowhere in Schylling's public warnings or statements—including its product labels and e-commerce warnings, website and FAQ, social-media communications, or responses to news reports—does Schylling disclose, much less warn, that a NeeDoh product may explode or violently rupture and expel filler hot enough to cause severe burns.

92. This omission persists even when Schylling responds directly to reports expressly describing NeeDoh products exploding, ejecting hot and adhesive contents, causing severe burns, scarring, hospitalization, and, in one instance, a medically induced coma. In those responses, Schylling characterizes the incidents merely as product "misuse" that is "dangerous" and "may cause injury," without identifying the actual mechanism or severity of the hazard.[52]

---

[51] See Instagram Post, @needohofficial, April 3, 2026, https://www.instagram.com/p/DWr8PSVAPb2/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA== (last accessed August 6, 2026).
[52] See Charna Flam, Girl, 7, Ends Up in Coma with Severe Burns After Microwaving Popular Squishy Toy, People (Mar. 20, 2025), https://people.com/girl-7-coma-with-severe-burns-after-microwaving-popular-squishy-toy-needoh-11699893

93. Schylling's warning concerning foreseeable environmental heat is similarly incomplete. The warning states only: "Do NOT leave in a hot car or direct sun: contents may become hot." It does not warn that the contents may reach temperatures capable of causing severe burns; that the exterior may not reliably reveal the filler's internal temperature; that heating may cause pressure to build within the sealed shell; that the product may rupture or explode when subsequently handled or squeezed; or that the expelled viscous filler may adhere to the skin and prolong the resulting thermal injury. Thus, although Schylling acknowledges that ordinary environmental conditions may heat the contents of the toy designed for 3-year-olds, it omits any warning that those conditions may result in explosive rupture or burn injury.

94. Schylling's separate warning concerning microwave use likewise states only: "Do NOT heat, freeze or microwave; may cause personal injury." That generalized reference to unspecified "personal injury" does not tell consumers that the enclosed filler may rapidly overheat and build pressure; that the product may explode after it has been removed from the microwave or when it is squeezed; or that the explosion may propel scalding, adhesive material onto a child. Nor does it disclose that the resulting burns may require emergency treatment, hospitalization, or treatment for permanent scarring. Medical experts have explained that the heated gel may build pressure until the product explodes and that its thickness causes it to adhere to skin, potentially producing deeper burns than ordinary hot liquid.[53] [54]

95. Likewise, Schylling's FAQ intentionally minimizes the danger. Its only discussion of escaped filler treats the event as an ordinary cleanup problem and instructs consumers merely to pick up or clean the material. The FAQ does not warn that escaped filler may be dangerously hot, that it may adhere to skin and cause burns, or that consumers should avoid contact, immediately cool or irrigate an exposed area, protect the eyes and airway, or seek emergency medical treatment. The FAQ describes the filler 'escaping' but does not disclose that filler may 'escape' because the product has explosively ruptured from internal heat and pressure. By describing escaped filler only as something to be cleaned up, Schylling's FAQ affirmatively

---

[53] See https://www.loyolamedicine.org/stories/nine-year-old-burns-himself-after-learning-tiktok-trend-involving-popular-sensory-toy (last accessed August 6, 2026).
[54] See https://www.parents.com/what-is-the-needoh-microwave-trend-11910993 (last accessed August 6, 2026).

conveys that leakage is a housekeeping concern rather than a potentially serious safety emergency.[55]

96. Schylling's repeated selection of vague terms such as "hot" and "personal injury," while omitting explosion, scorching filler, adhesion to skin, severe burns, and the potential need for emergency treatment, is particularly significant because Schylling had received numerous reports describing those exact consequences. Schylling's continued omission of the known mechanism and severity of the hazard—across its labels, website, FAQ, e-commerce warnings, social-media communications, and responses to the press—demonstrates that its failure to provide a complete warning was knowing and deliberate.

**F. Plaintiff's Purchase and Injury**

97. On or about April 30, 2026, K.M. received a NeeDoh Nice Cube as a gift that had been purchased in South Carolina for personal, family, and household use. The product was marketed as a sensory and fidget toy intended to be squeezed, manipulated, and repeatedly used by children. Plaintiff reasonably expected the product to remain safe during foreseeable use and foreseeable misuse by children, including conduct Schylling knew was occurring as part of popular social-media trends involving the product.

98. Before purchase, Plaintiff saw the NeeDoh name, the product, and packaging or point-of-sale presentation that portrayed it as a squeezable sensory or fidget toy. Schylling intended consumers to understand that the product was suitable for the ordinary squeezing, carrying, and storage associated with such a toy.

99. Had Schylling conspicuously disclosed that microwave exposure could rapidly superheat the filler, create dangerous internal pressure, cause explosive rupture, and eject adhesive material capable of causing severe burns, Plaintiff would not have purchased the product or would have paid materially less for it. The omitted risk was material and not reasonably discoverable by consumers.

---

[55] See Schylling FAQ, https://schylling.com/faqs/ (last accessed August 6, 2026).

100. No warning presented to Plaintiff adequately disclosed that microwave heating could cause the Nice Cube to explode or rupture and eject dangerously hot filler capable of causing severe burns.

101. K.M. used the product in a reasonably foreseeable manner after participating in a widely known social-media trend involving the microwaving of NeeDoh products. Schylling knew or should have known of this conduct long before Plaintiff's injury.

102. After microwave exposure, the Nice Cube did not appear unreasonably dangerous or visibly superheated. When K.M. squeezed the product, it ruptured or exploded and released its contents onto her skin.

103. The incident was substantially similar to previously reported NeeDoh failures involving microwave heating, rupture, explosion, and thermal burn injuries.

104. The Nice Cube reached Plaintiff without substantial change from the condition in which it left Schylling's control.

105. Had Schylling warned that a microwaved NeeDoh could remain internally superheated, build pressure, explode after removal from the microwave, and project adhesive filler capable of causing severe burns, Plaintiff and K.M. would have avoided the conduct and the injury would not have occurred.

106. As a direct and proximate result of the defects and omissions, K.M. suffered physical pain, a thermal burn and skin injury, redness, irritation, emotional distress associated with the unexpected incident, cleanup, and economic loss, in amounts to be proven.

### G. Materiality and Economic Injury

107. The undisclosed hazard is material to a reasonable consumer. A parent, teacher, caregiver, or consumer buying a sensory toy for a child would consider it important that the toy can rupture or explode after foreseeable heat exposure and release sticky hot filling capable of causing burns.

108. Consumers pay for a safe, durable, reusable sensory product—not a sealed container that requires temperature-controlled handling or constant supervision to prevent explosion. A product containing an undisclosed defect is worth less than a product that performs safely as reasonably expected.

109. Had Defendant disclosed the true risk and provided an adequate warning, Plaintiff and reasonable Class members would not have purchased the NeeDoh Products, would have paid materially less, or would have selected a safer alternative.

110. Defendant's omission allowed it to charge and retain the full market price while shifting the risk and cost of rupture and explosion, burns, irritation, cleanup, and disposal to consumers. Defendant thereby obtained money it would not have received had the truth been disclosed.

111. Schylling had exclusive and superior knowledge of product specifications, filling formulations, skin and seam tolerances, thermal and cycle testing, complaint data, retailer communications, CPSC reports, and the chronology and rationale for its warning changes. Consumers could not reasonably discover that information before purchase.

112. Defendant continues to sell NeeDoh Products throughout South Carolina and the United States. Plaintiff would consider purchasing a NeeDoh Product in the future if the products were redesigned to eliminate the alleged hazards and were accompanied by complete, truthful, and conspicuous warnings. Plaintiff is presently unable to rely upon Defendant's labels, packaging, representations, or warnings to determine whether the alleged defect has been corrected or whether a particular NeeDoh Product is safe. This inability to rely upon Defendant's representations constitutes an ongoing and imminent threat of future harm sufficient to support standing for prospective injunctive relief. See Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 969-72 (9th Cir. 2018); Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 185 (2000).

112(a). Declaratory relief is independently appropriate because an actual and substantial controversy exists between Plaintiff and Defendant concerning the adequacy of Defendant's warnings, product disclosures, safety communications, and ongoing sale of NeeDoh Products. Defendant continues to market and sell NeeDoh Products using warnings that Plaintiff contends are inadequate and misleading. Plaintiff seeks a determination of the parties' respective rights and obligations concerning those warnings and Defendant's duties to provide adequate safety disclosures. This controversy is definite and concrete, concerns legal relations having adverse legal interests, and is of sufficient immediacy and reality to warrant declaratory relief. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126-27 (2007).

## CLASS ACTION ALLEGATIONS

Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of herself and the following proposed classes:

**South Carolina Economic Loss Class**

All persons who acquired, received or owned a NeeDoh Product in South Carolina for personal, family, or household use during the applicable limitations period.

**South Carolina Personal Injury Subclass**

All persons within the South Carolina Economic Loss Class who sustained bodily injury after a NeeDoh Product ruptured, burst, exploded, or ejected its contents during intended use or reasonably foreseeable use or misuse, including foreseeable heat exposure and microwave exposure.

113. Plaintiff brings the economic-loss claims asserted in this Complaint on behalf of herself and the South Carolina Economic Loss Class and brings the strict liability claims on behalf of herself and the South Carolina Personal Injury Subclass pursuant to Rules 23(a),23(b)(2), 23(b)(3) and 23(c)(4).

114. Excluded from the Class and Subclass are Defendant; its parents, subsidiaries, affiliates, officers, directors, and employees; the judicial officers assigned to this action and their immediate families; counsel for the parties; persons who timely request exclusion; and persons whose claims have been finally adjudicated.

115. The South Carolina Class claims seek economic and injunctive relief arising from the undisclosed defect and do not seek personal-injury damages. The South Carolina Injury Subclass asserts strict-liability claims arising from the common rupture-and-exposure hazard. Plaintiff seeks certification of common liability issues for that Subclass, with person-specific medical causation, comparative-fault defenses, and compensatory damages determined in individual proceedings if necessary. Plaintiff also asserts all of her personal-injury claims individually.

116. Numerosity: The Class is so numerous that joinder is impracticable. Schylling has reported selling more than 100 million NeeDoh units, and the products are sold through major national and South Carolina retail channels. On information and belief, the South Carolina Class includes many thousands of purchasers.

117. The exact number of South Carolina Injury Subclass members is presently unknown because incident complaints, returns, retailer reports, insurance claims, CPSC communications, and post-sale contacts are controlled by Schylling and third parties. Public reports describe repeated burns and irritation, multiple intended-use and hot-car ruptures, and South Carolina burn-center treatment of the same filled squishy-toy injury mechanism. On information and belief, the Subclass is sufficiently numerous and geographically dispersed that joinder is impracticable.

118. Ascertainability: South Carolina Class membership can be determined through Defendant's sales and distribution records, retailer and e-commerce records, receipts, loyalty records, declarations, and other objective proof of a South Carolina NeeDoh purchase. Injury Subclass membership can additionally be determined from incident reports, photographs, medical records, claims, communications, and declarations showing rupture or leakage and resulting bodily injury. Both definitions use objective criteria.

119. Commonality and Predominance: Common questions of law and fact include:

a. Whether the NeeDoh Products share a common propensity to rupture or release their filling under foreseeable use or heat;

b. Whether Defendant knew or should have known of the heat, rupture, explosion, burn, adhesion, and irritation hazards before Class members' purchases;

c. Whether Defendant's packaging, warnings, product pages, and marketing omitted or inadequately disclosed those hazards;

d. Whether microwave exposure, heat exposure from automobiles, sunlight, indoor window exposure, and other temperature-related uses or misuses of NeeDoh products were reasonably foreseeable to Schylling, particularly after Schylling became aware of social-media trends, consumer complaints, injury reports, and burn

incidents involving similar conduct. See Allen v. Long Mfg. NC, Inc., 332 S.C. 422, 505 S.E.2d 354 (Ct. App. 1998) (manufacturer has duty to warn of latent dangers associated with reasonably foreseeable uses of its product);

e. Whether Defendant's statements that the products are child-oriented sensory toys for schools, cars, homes, special-needs users, and use anywhere or anytime were misleading without disclosure of the hazard;

f. Whether Defendant violated SCUTPA, implied warranties, and duties against fraudulent concealment;

g. Whether the NeeDoh Products were worth less than the amount consumers paid because of the latent defect and inadequate warning; and

h. Whether injunctive relief requiring revised warnings or corrective disclosures is appropriate.

120. The South Carolina Injury Subclass presents the following additional common questions:

a. Whether the NeeDoh Products' shared construction and propensity to rupture rendered them defective and unreasonably dangerous under South Carolina products-liability law are common questions capable of classwide resolution through common proof. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016);

b. Whether warnings that contents may become hot or that heating may cause unspecified personal injury adequately disclosed rupture, explosion, sticky filling, thermal burns, irritation, indoor sunlight, hot-car exposure, and foreseeable microwave misuse, consistent with the manufacturer's duty to warn of latent hazards under South Carolina law. See Allen v. Long Mfg. NC, Inc., 332 S.C. 422, 505 S.E.2d 354 (Ct. App. 1998);

c. Whether the heat, pressure, outer shell, seam, and filling risks were known or knowable when the products were distributed;

d. Whether Schylling's product-line design, testing, warning, and post-sale warning decisions were common conduct capable of resolution with common proof;

e. Whether Schylling microwave exposure was a reasonably foreseeable use or missuse of NeeDoh products;

f. Whether Schylling's warning that heating "may cause personal injury" adequately disclosed the risks of superheating, internal pressure, rupture, explosion and severe burns; and

h. Whether an adequate warning should have been placed on the product itself.

121. The common defect and omission can be proved with common evidence, including product specifications, testing, incident data, complaints, CPSC communications, warning versions, marketing materials, sales data, expert testing, and Schylling's uniform decision-making. Although the wording of Schylling's warnings changed, every challenged version omitted the same essential facts: that foreseeable heat can cause a NeeDoh Product to rupture or explode, eject sticky filling, and burn the user. Class wide exposure, materiality, causation, and the adequacy of those warnings therefore can be decided through common proof rather than individualized purchasing inquiries. Common questions predominate because Defendant's design, testing, marketing, warning, and post-sale conduct were uniform across the proposed classes and may be established through common evidence. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016).

121(a). Common evidence will establish whether microwave use of NeeDoh Products was reasonably foreseeable. Schylling publicly promoted the brand through social-media platforms, monitored consumer engagement, acknowledged widespread social-media activity involving NeeDoh Products, received reports of injuries associated with heated microwave exposure and other heat-related uses reasonably foreseeable presents a common question capable of classwide resolution.

122. For the South Carolina Injury Subclass, the existence of a common defect, the adequacy of Schylling's warnings, Schylling's knowledge, the feasibility of safer warnings and designs, and the products' capacity to cause the alleged rupture and adhesion injury mechanism can be decided using the same product-line evidence. Those issues predominate within the proposed issue class and will materially advance each Subclass member's claim even if individual injury and damages proceedings remain. Common questions predominate because Defendant's design,

testing, marketing, warning, and post-sale conduct were uniform across the proposed classes and may be established through common evidence. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016).

123. Substantial Similarity. The named NeeDoh Products are substantially similar for standing and class purposes because each is a filled NeeDoh squeeze product sold for the same sensory purpose; each uses a flexible outer shell around viscous contents; each was sold without a warning that disclosed the alleged rupture, ejection, and burn mechanism; and each presents the same alleged rupture and-exposure hazard. Product-specific differences can be addressed through subclasses or issue certification if necessary.

124. Plaintiff's claims are typical because K.M. received a NeeDoh Product in South Carolina that was subject to the same alleged omissions, warnings, marketing representations, and product-line conduct challenged on behalf of the Class.

125. Plaintiff's strict-liability claims are typical of the South Carolina Injury Subclass because the NeeDoh product ruptured or exploded during foreseeable use, its filling contacted her skin, and she suffered a burn and irritation caused by the same warnings and product-line hazards challenged on behalf of the Subclass.

126. Adequacy. Plaintiff will fairly and adequately protect the Class's and Subclass's interests. She has no conflict with absent or injured owners and understands the obligation to represent them, and has retained counsel experienced in consumer-protection, product-liability, and class-action litigation.

127. Superiority. A class action is superior for the South Carolina Class because individual losses from purchasing a low-cost toy are too small to justify separate litigation, while the common proof and relief make aggregate adjudication efficient. Class treatment avoids inconsistent rulings and permits consumers to obtain relief that would otherwise be practically unavailable.

128. Defendant has acted and continues to act on grounds generally applicable to the Class by utilizing uniform packaging, warnings, omissions, labeling practices, and marketing representations concerning NeeDoh Products. Plaintiff seeks final injunctive and declaratory relief requiring Defendant to provide complete and truthful disclosures regarding the alleged rupture, explosion, heat, and burn hazards. Such relief is appropriate under Rule 23(b)(2)

because Defendant's conduct applies generally to all Class members and injunctive relief would provide class-wide benefit.

129. Rule 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to the Class by using common warnings and omissions and continuing to market the NeeDoh Products. Final injunctive and declaratory relief is therefore appropriate respecting the Class as a whole.

129(a). Declaratory relief is appropriate pursuant to 28 U.S.C. §§ 2201 and 2202 because a live controversy exists regarding whether Defendant's warnings, omissions, and safety disclosures concerning NeeDoh Products satisfy Defendant's legal obligations under South Carolina law. A declaration will clarify and settle the legal relations at issue and will terminate uncertainty regarding Defendant's continuing warning and disclosure practices. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126-27 (2007).

130. Manageability. The case is manageable through common records and evidence. The Court may certify the Class and Injury Subclass as defined; certify design-defect, failure-to-warn, knowledge, general-causation, or other common issues under Rule 23(c)(4); create product, filling, heat-source, warning-version, or time-period subclasses; or modify the definitions as discovery warrants.

**FIRST CAUSE OF ACTION**

**(Strict Products Liability—Failure to Warn)**
**(Plaintiff Individually and on Behalf of the South Carolina Injury Subclass)**

131. Plaintiff incorporates every preceding allegation as though fully set forth here.

132. Schylling designed, manufactured or caused to be manufactured, imported, distributed, labeled, and sold the NeeDoh Products, including Plaintiff's Nice Cube, and placed them into the stream of commerce. The products reached Plaintiff and Injury Subclass members without substantial change relevant to the alleged warning defect.

133. South Carolina recognizes strict products liability claims against manufacturers and sellers who place defective and unreasonably dangerous products into the stream of commerce. See Marchant v. Lorain Division of Koehring, 272 S.C. 243, 251 S.E.2d 189 (1979). A product is unreasonably dangerous when it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer possessing the ordinary knowledge common to the

community as to the product's characteristics. See Claytor v. General Motors Corp., 277 S.C. 259, 286 S.E.2d 129 (1982).

134.. The Nice Cube presented risks of rupture, explosion, thermal burn, prolonged skin contact from adhesive filling, and irritation during intended or reasonably foreseeable storage, use, and handling. These risks were known or knowable to Schylling and gave rise to a duty to provide adequate warnings under South Carolina law. See Allen v. Long Mfg. NC, Inc., 332 S.C. 422, 505 S.E.2d 354 (Ct. App. 1998).

135. Ordinary consumers would not recognize the nature and magnitude of the risk. A warning that contents may become hot or that heating may cause undefined injury did not disclose that indoor or ambient heat could pressurize or weaken the toy, cause it to rupture or explode, and expel sticky material capable of causing burns or irritation.

135(a). South Carolina law imposes a duty upon manufacturers to provide adequate warnings of latent dangers associated with reasonably foreseeable uses of their products when those dangers are not open and obvious to ordinary consumers. See Allen v. Long Mfg. NC, Inc., 332 S.C. 422, 505 S.E.2d 354 (Ct. App. 1998). The risks of internal superheating, pressure accumulation, rupture, explosion, and expulsion of adhesive filler were not apparent to ordinary consumers, particularly children, and therefore required adequate warning.

136. A specific, conspicuous, durable warning was feasible and would have reduced or avoided the foreseeable risk. Across warning versions, the failure to disclose rupture or explosion, ejection of sticky hot filling, serious burns, indoor sunlight, hot-car exposure, and cooling and first-aid precautions rendered the NeeDoh Products defective and unreasonably dangerous. See Allen v. Long Mfg. NC, Inc., 332 S.C. 422, 505 S.E.2d 354 (Ct. App. 1998).

137. Plaintiff was a foreseeable user. Further, K.M.'s microwave exposure of the NeeDoh Product constituted a reasonably foreseeable misuse. South Carolina law recognizes that a manufacturer's duty to warn extends not only to intended uses but also to reasonably foreseeable uses and misuses of a product. See Allen v. Long Mfg. NC, Inc., 332 S.C. 422, 505 S.E.2d 354 (Ct. App. 1998). By November 2024, if not earlier, Schylling knew or should have known that children were microwaving NeeDoh Products as part of a widespread social-media trend and that severe burn injuries had already occurred as a result. Despite that knowledge, Schylling failed to

provide a warning identifying the actual risks of internal superheating, pressure buildup, rupture, explosion, and ejection of adhesive filler capable of causing severe burns.

138. Whether Schylling knew or should have known that children were engaging in microwave heating of NeeDoh Products as part of a widespread and foreseeable social-media trend, thereby creating a duty to provide warnings regarding the specific dangers of superheating, pressure buildup, rupture, explosion, and thermal burns.

139.The warning defect was a substantial factor and direct and proximate cause of the rupture and Plaintiff's burn, redness, bruising or discoloration, irritation, pain, emotional distress, economic loss, and other damages to be proven at trial.

140. South Carolina Injury Subclass members likewise suffered bodily injury after a NeeDoh Product ruptured, burst, exploded, or leaked during intended or reasonably foreseeable use, storage, handling, or temperature exposure. These strict-liability claims do not depend on purchasing reliance. Plaintiff seeks common determinations concerning defect, warning adequacy, knowability, and Schylling's product-line conduct, with claimant-specific exposure, warning causation, medical causation, defenses, and damages determined separately to the extent required.

141. Plaintiff and South Carolina Injury Subclass members are entitled to compensatory damages and all other relief available under South Carolina strict products liability law. See Marchant v. Lorain Division of Koehring, 272 S.C. 243, 251 S.E.2d 189 (1979).

**SECOND CAUSE OF ACTION**

**(Strict Products Liability—Design Defect)**
**(Plaintiff Individually and on Behalf of the South Carolina Injury Subclass)**

142. Plaintiff incorporates every preceding allegation as though fully set forth here.

143. The Nice Cube failed to perform as safely as an ordinary consumer would expect when subjected to foreseeable child use and foreseeable misuse. An ordinary consumer does not expect a children's sensory toy to become a superheated pressure vessel after brief microwave exposure and subsequently explode when squeezed. The product was therefore defective and unreasonably

dangerous under South Carolina law. See Claytor v. General Motors Corp., 277 S.C. 259, 286 S.E.2d 129 (1982).

144. The same consumer expectation applies to the NeeDoh Products acquired or owned by South Carolina Injury Subclass members: a child-oriented squeeze toy should remain contained during reasonably foreseeable squeezing, carrying, storage, ambient heat, and temperature exposure, and should not rupture or eject material capable of adhering to skin and causing burns or irritation.

145. The NeeDoh Products were defective and unreasonably dangerous under South Carolina law and also defective under the risk-utility analysis recognized in Branham v. Ford Motor Co., 390 S.C. 203, 701 S.E.2d 5 (2010). The gravity and probability of burns, eye or face injury, irritation, scarring, and injury to children outweighed the utility of using a heat-sensitive, adhesive filling and enclosure unable to tolerate foreseeable heat and mechanical stress.

145(a). South Carolina applies the risk-utility test to design defect claims and requires consideration of whether a reasonable alternative design existed that would have reduced or avoided the foreseeable risk of harm. Branham v. Ford Motor Co., 390 S.C. 203, 701 S.E.2d 5 (2010).

145(b). The foreseeable risks associated with the NeeDoh Products, including rupture, explosion, expulsion of heated filler, severe burns, skin adhesion, irritation, scarring, and disfigurement, substantially outweighed any utility associated with the challenged design. The utility of a child-oriented sensory toy is not dependent upon the use of a filler or shell configuration that permits dangerous pressure accumulation, heat retention, explosive rupture, or prolonged thermal contact with the skin.

146. Reasonable alternative designs were technologically and economically feasible at the time the NeeDoh Products were designed, manufactured, and distributed. These alternative designs would have reduced or eliminated the risk of injury while preserving the utility of the product as a sensory toy. reasonable alternative designs existed and will be identified through expert discovery. The existence of such reasonable alternative designs satisfies the requirements articulated in Branham v. Ford Motor Co., 390 S.C. 203, 701 S.E.2d 5 (2010).

147. The alleged common design defects existed when the products left Schylling's possession. Plaintiff used or stored her Nice Cube in a reasonably foreseeable way, and it had not been substantially modified. South Carolina Injury Subclass members' products likewise failed during intended or reasonably foreseeable use, storage, handling, or temperature exposure.

148. The design defect was a substantial factor and direct and proximate cause of the rupture and Plaintiff's physical, emotional, property, and economic injuries.

149. Plaintiff seeks common determinations for the South Carolina Injury Subclass concerning the shared design architecture, defect, consumer expectations, risk-benefit factors, feasible safer alternatives, and general capacity to cause the alleged injury mechanism. Individual exposure, specific causation, defenses, and damages may be determined separately, including determinations concerning the existence of feasible alternative designs as required by *Branham v. Ford Motor Co.*

149(a). South Carolina courts recognize that manufacturers have a duty to design products that are reasonably safe for their foreseeable uses and misuses. See *Branham v. Ford Motor Co.*, 390 S.C. 203, 701 S.E.2d 5 (2010); *Rife v. Hitachi Constr. Mach. Co.*, 363 S.C. 209, 609 S.E.2d 565 (Ct. App. 2005).

150. Plaintiff and South Carolina Injury Subclass members are entitled to compensatory damages and all other relief available under South Carolina law.

**THIRD CAUSE OF ACTION**

**(Fraudulent Concealment and Omission)**
**(Plaintiff and the South Carolina Class)**

151. Plaintiff incorporates every preceding allegation as though fully set forth here.

152. Throughout the Class Period, Schylling marketed and sold NeeDoh Products, including Plaintiff's Nice Cube purchased in April 2026, through product packaging, labels, point-of-sale materials, its website, e-commerce listings, and retailer channels that presented the products as child-oriented sensory toys, safe for children ages 3 and up, while omitting the known rupture, heat, burn, adhesion, and irritation hazards. Schylling personnel with authority to establish nationwide product-safety, labeling, and warning policy received or reviewed the reported burn

and rupture incidents and authorized or ratified Schylling's continued sales and incomplete warning response. Those personnel exercised substantial discretionary authority over corporate policy and were officers, directors, or managing agents acting within the scope of their authority whose conduct may be imputed to Defendant for purposes of punitive damages under South Carolina law, including S.C. Code Ann. § 15-32-520 and related South Carolina punitive-damages principles as well as *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999).

153. Schylling had a duty to disclose because it possessed exclusive and superior knowledge of a latent safety defect; made partial representations about the products' durability and safety that were misleading without the omitted facts; marketed the toy for such use, actively concealed or minimized the specific consequence of heat exposure; and was required to correct prior statements when it learned the truth. See *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999).

154. Schylling knew the omitted facts were material. Its addition of product-line warnings, communications with the CPSC, public statements about injury, and efforts to remove misuse content demonstrate that it understood the information would affect consumer conduct and purchasing decisions.

155. Schylling intended that Plaintiff and Class members rely on the incomplete presentation and purchase the NeeDoh Products without demanding a lower price, selecting alternatives, or declining the transaction. The omission protected sales of a toy whose appeal depends on appearing soothing, safe, portable, and suitable for children.

156. The omitted hazard was material to a reasonable consumer and was not reasonably discoverable. Because Schylling omitted the same essential rupture, explosion, and burn hazard from each challenged point-of-sale presentation, causation and reliance are susceptible to common proof and an inference of reliance arises from objective materiality, rather than from each Class member's subjective purchasing motivations.

157. Had the truth been disclosed, Plaintiff and her household would not have acquired, accepted, owned or allowed K.M. to use the product. The Class suffered economic damage measurable through common evidence of the purchase price, a price premium, or the difference

between the value represented and value received. Plaintiff also suffered individual physical and consequential damages. See *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999).

158. Schylling acted intentionally, fraudulently, and with conscious disregard for consumer safety after receiving reports of burns and ruptures. Plaintiff therefore seeks compensatory and punitive damages, restitution where available, and other relief permitted by law. Such conduct was willful, wanton, and reckless and supports an award of punitive damages under South Carolina law, including S.C. Code Ann. §§ 15-32-520 through 15-32-540.

## FOURTH CAUSE OF ACTION

**(Breach of the Implied Warranty of Merchantability)**
**(Plaintiff and the South Carolina Class)**

159. Plaintiff incorporates every preceding allegation as though fully set forth here.

160. NeeDoh Products are consumer goods purchased or used primarily for personal, family, or household purposes and therefore constitute "consumer goods" within the meaning of S.C. Code Ann. 36-9-102(a)(23). Under S.C. Code Ann. §36-2-314, each retail sale of a NeeDoh Product in South Carolina was accompanied by Schylling's implied warranty that the product was merchantable, including that it was fit for its ordinary purposes and adequately contained, packaged, and labeled.

161. Schylling is a merchant with respect to goods of this kind within the meaning of S.C. Code Ann. § 36-2-104, and the implied warranty imposed by S.C. Code Ann. § 36-2-314 accompanied each covered retail sale in South Carolina.

162. The NeeDoh Products were not fit for their ordinary purpose as safe, reusable, squeezable sensory toys because they could rupture under foreseeable heat conditions and expose consumers to sticky hot or irritating filling without an adequate warning. They also failed to conform to the promises and affirmations on their labeling and marketing.

163. The latent defect existed when the products left Schylling's possession and at the time of retail sale. The defect rendered the products unfit for their ordinary purpose as reusable squeeze and sensory toys.

164. As a direct and proximate result, Plaintiff and Class members obtained products that were worth less than represented and suffered damages recoverable under UCC warranty remedies, S.C. Code §§ 36-2-714 and 36-2-715. Plaintiff seeks all damages available under South Carolina law resulting from Defendant's breach of the implied warranty of merchantability.

## FIFTH CAUSE OF ACTION

**(Violation of the South Carolina Unfair Trade Practices Act.**
**(S.C. Code Ann. § 39-5-10 et seq.)**
**(South Carolina Class)**

165. Plaintiff incorporates the preceding factual and class allegations as though fully set forth herein, except that Plaintiff does not incorporate into this cause of action any request for damages, restitution, punitive damages, or other monetary relief.

166. Plaintiff and Class members are consumers who obtained or purchased Needoh products for personal, family, or household purposes. Their purchases were transactions within S.C. Code Ann. 39-5-10(b).

167. Schylling violated S.C. Code Ann. § 39-5-20(a) by representing, through statements, half-truths, and material omissions, that the NeeDoh Products had characteristics, uses, benefits, quality, or safety they did not have and were of a standard or quality different from the truth.

168. Specifically, Schylling presented the products as safe, portable sensory toys for children, schools, homes, cars, special-needs users, and ordinary repeated squeezing, while failing to disclose that foreseeable heat or use could cause rupture or explosion and release sticky hot or irritating filling capable of causing burns and serious injury.

169. The omitted facts were material, and Schylling had a duty to disclose them. Plaintiff would have seen and heeded a conspicuous disclosure and would not have allowed K.M. to acquire the Nice Cube. As to the Class, causation and reliance arise from common proof of the uniform material omission, not individualized purchasing motivations.

170. Plaintiff has served, or will serve, a copy of the Complaint upon the South Carolina Attorney General as required by S.C. Code Ann. § 39-5-140(a). Plaintiff seeks injunctive relief, attorneys' fees, costs and all other relief authorized by the South Carolina Unfair Trade Practices Act.

171. The violations caused Plaintiff and Class members to suffer actual economic injury. Schylling's conduct was knowing, willful, fraudulent, and undertaken despite specific notice of consumer injuries.

172. Plaintiff seeks relief under this Fifth Cause of Action solely in the form of prospective injunctive relief, declaratory relief as permitted by law, reasonable attorneys' fees, costs, and such other non-monetary relief as may be authorized by the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-140. Plaintiff does not seek actual damages, treble damages, restitution, disgorgement, punitive damages, benefit-of-the-bargain damages, diminished-value damages, or any other form of monetary recovery under this Cause of Action.

172(a). Any request elsewhere in this Complaint for compensatory damages, restitution, disgorgement, actual damages, benefit-of-the-bargain damages, diminished-value damages, punitive damages, or other monetary relief is asserted only with respect to those causes of action under which such relief is legally available, including Counts III, IV, and VI, and is not asserted under this Fifth Cause of Action.

**SIXTH CAUSE OF ACTION**

**(Violation of South Carolina Unfair Trade Practices Act Based Upon False and Misleading Advertising)**

173. Plaintiff incorporates every preceding allegation as though fully set forth here.

174. Schylling disseminated or caused to be disseminated advertising in South Carolina that described NeeDoh Products as child-oriented sensory toys for squeezing, schools, special-needs users, cars, homes, and for use anywhere or anytime.

175. Those representations were untrue or misleading because they omitted the known, material fact that foreseeable heat, storage, handling, or use could cause the products to rupture or explode and release sticky hot or irritating filling capable of causing burns and serious injury.

176. Schylling knew or should have known the advertising was misleading in light of its product knowledge, complaints, CPSC reports, hot-car incidents, public responses, and warning changes.

177. Plaintiff actually relied on the packaging and sensory-toy presentation in permitting the ownership of the Nice Cube and the omitted hazard was material. The same objective, material

omission appeared across the challenged product-line presentations, making deception and causation susceptible to common proof for the Class.

178. Plaintiff seeks restitution, equitable monetary relief, injunctive relief, attorneys' fees, costs, and all other relief authorized by applicable South Carolina law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the proposed South Carolina Economic Loss Class and South Carolina Personal Injury Subclass, requests judgment against Defendant and the relief set forth below.

A. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; certify the South Carolina Economic Loss Class and South Carolina Personal Injury Subclass; appoint Plaintiff as Class Representative; and appoint Plaintiff's counsel as Class Counsel;

B. Determine and declare that Defendant's conduct violated the laws alleged in this Complaint;

C. Award Plaintiff individually compensatory damages for physical injuries, pain and suffering, emotional distress, medical expenses, loss of enjoyment of life, economic losses, and all other damages recoverable by law in an amount to be determined at trial;

D. Award compensatory damages and all other relief permitted by law to members of the South Carolina Personal Injury Subclass on the strict liability and products liability claims asserted herein;

E. Award restitution, disgorgement, actual damages, benefit-of-the-bargain damages, diminished value damages, and all other available monetary relief to Plaintiff and members of the South Carolina Economic Loss Class on Counts III (Fraudulent Concealment), IV (Breach of Implied Warranty of Merchantability), and VI (False and Misleading Advertising), and not under Count V except to the extent

that attorneys' fees, costs, declaratory or injunctive relief are expressly authorized by law;

F. Award punitive damages to the fullest extent permitted by South Carolina law on all claims for which punitive damages are recoverable;

G. Enter preliminary and permanent injunctive relief pursuant to Rules 23(b)(2) and 65 of the Federal Rules of Civil Procedure requiring Defendant to provide complete, truthful, durable, and conspicuous warnings concerning rupture, explosion, heat exposure, burn hazards, adhesion hazards, storage requirements, and first-aid measures; requiring corrective disclosures and notices to consumers; and awarding such additional equitable relief as necessary to prevent future consumer injury;

H. Pursuant to 28 U.S.C. §§ 2201 and 2202, enter a declaratory judgment that Defendant's warnings, disclosures, and safety communications concerning NeeDoh Products are inadequate, misleading, and fail to disclose material risks associated with rupture, explosion, heat exposure, expulsion of filler, and burn hazards, and declaring the parties' rights and obligations with respect to such warnings and disclosures. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007);

I. Award reasonable attorneys' fees, costs, litigation expenses, and allowable statutory recoveries;

J. Award pre-judgment and post-judgment interest as permitted by law; and

K. Grant such other and further relief as the Court deems just and proper.

*(Signature on following page)*

**BELL LEGAL GROUP, LLC**

s// J. Ryan Heiskell

J. Ryan Heiskell (Federal Bar #10112)
J. Edward Bell (Federal Bar #1280)
219 Ridge Street
Georgetown, SC 29440
(843) 546-2408
rheiskell@belllegalgroup.com
jeb@belllegalgroup.com